RAMÓN PARÉS COLLAZO, conocido por RAMÓN G. PARÉS, demandante y apelado, *v.* MARÍA ECHANDI, demandada y apelante.

Núm. 7864.—*Sometido:* Mayo 29, 1939. *Resuelto:* Junio 21, 1939.

*Carlos H. Juliá*, abogado de la apelante; *Herminio Miranda* y *R. Díaz Collazo*, abogados del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Se trata en este caso de una acción de divorcio establecida por el marido, basada en abandono. La demanda fué radicada en la Corte de Distrito de Arecibo, de donde fué trasladada a la de San Juan. Alegó el demandante que contrajo matrimonio con la demandada en Manatí, el primero de julio de 1920, y que tienen un hijo llamado Héctor que en la fecha de la radicación de la demanda, el 5 de mayo de 1938, contaba diez y siete años de edad. Que durante el matrimonio no adquirieron bienes y que el 4 de mayo de 1937,

la demandada, sin motivo, causa ni justificación legal alguna, abandonó al demandante negándose a reasumir la vida conyugal.

La demandada excepcionó primero y contestó después la demanda. Admitió sus alegaciones esenciales, excepto las concernientes al alegado abandono, y como defensas especiales alegó:

Que con anterioridad al 4 de mayo de 1937 sufrió una delicada operación quirúrgica, abandonando el hospital para recluirse en su hogar y seguir un riguroso tratamiento médico. Que en tales circunstancias y temerosa de no recuperar plenamente su salud, se marchó al hogar de su madre en Manatí para seguir atendiéndose allí en debida forma. Hace entonces la demandada dos imputaciones de actos de excesiva crueldad y desconsideración por parte del demandante relacionados con su vida íntima matrimonial, a los cuales no hacemos referencia porque, siendo tan graves y no habiéndose ofrecido evidencia alguna para sostenerlos ni tampoco para negarlos, injustamente perjudicaríamos al demandante con la sola exposición de tales actos. Continúa entonces alegando la demandada que velando por su salud, dado el peligro que corría su vida permaneciendo en el hogar conyugal, optó por marcharse al de sus padres en Manatí hasta que hubiera recuperado por completo su salud. Que su ausencia del hogar conyugal ha sido meramente transitoria, no habiendo tenido nunca el propósito firme y decidido de abandonarlo, y que siempre estuvo decidida a volver a vivir con su esposo el demandante. Niega que haya alguna vez manifestado deseos de abandonar el hogar y asegura que nunca ha sido requerida por el demandante para regresar al mismo, constándole como le constaba a aquél que su ausencia era meramente accidental y necesaria. Termina suplicando la desestimación de la demanda.

Desestimada la excepción previa de falta de causa de acción, se procedió a la celebración del juicio oral, que tuvo por resultado una sentencia que declaró con lugar la demanda

y decretó el divorcio. Apeló la demandada, basando su recurso en la comisión de cuatro errores que señala en su alegato, a saber:

"*Primero:* La corte inferior cometió error al permitir declarar al Lic. Román Díaz Collazo como testigo sobre proposiciones con relación a la situación económica de la demandada y sobre asuntos que no estaban alegados en la demanda ni formaban parte de la contención.

"*Segundo:* La resolución dictada en este caso es contraria a la ley sobre la materia.

"*Tercero:* La Corte inferior cometió error al declarar sin lugar la excepción previa de falta de causa de acción.

"*Cuarto:* La Corte inferior cometió manifiesto error en la apreciación de la prueba en este caso."

■ Es verdad que considerando una moción en que se solicitaba la desestimación del recurso por frívolo, este tribunal se expresó así:

"Señala cuatro errores. (Se refiere al alegato de la apelante.) Los tres primeros carecen de mérito. Quizás lo tenga el cuarto, por el que se imputa a la corte sentenciadora error en la apreciación de la prueba, pero no hay base en los autos para considerarlo, ya que no obstante aparecer de ellos que la apelante solicitó la transcripción de la evidencia por el taquígrafo, que el Juez ordenó a éste su preparación y que preparada la aprobó, es lo cierto que dicha transcripción no se ha elevado a esta Corte Suprema. Siendo ello así, nos vemos obligados a declarar con lugar la moción y en su consecuencia a desestimar el recurso."

Cuando esto se escribía, el tribunal confiaba en que estando aprobada la transcripción de la evidencia por el juez sentenciador, la apelante daría inmediatamente los pasos necesarios para elevar dicho documento, restableciéndose entonces, como en efecto se restableció, el recurso, que por los méritos de la prueba no resultó frívolo, como así se resolvió el 10 de mayo último. Empero, al examinar de nuevo el alegato de la apelante en la consideración del caso en sus méritos, estimamos que el segundo de los errores señalados no está desprovisto de fundamento. De las alegaciones y de la prueba

de ambas partes resulta como un hecho incontrovertido que la demandada salió del hogar conyugal el 4 de mayo de 1937. De la transcripción de autos resulta también que la demanda fué suscrita y jurada por el demandante ante el Subsecretario de la Corte de Distrito de Arecibo el 5 de mayo de 1938. No aparece en dicho documento la fecha de su radicación, pero de los autos resulta que el mismo día 5 de mayo de 1938 se expidió el emplazamiento. Como de acuerdo con e artículo 88 del Código de Enjuiciamiento Civil el emplazamiento no puede expedirse hasta después de radicada la demanda, apareciendo de los autos que la demanda se juró ante el Subsecretario de la Corte de Distrito de Arecibo el 5 de mayo y que el emplazamiento fué expedido ese mismo día, claro es que la demanda tuvo que haberse radicado necesariamente el día 5 de mayo en cualquier instante anterior a aquél en que se expidió el emplazamiento. Asumiendo que el alegado abandono se iniciase el 4 de mayo de 1937 con la salida de la demandada del hogar conyugal, y demostrado concluyentemente que la demanda se radicó el 5 de mayo de 1938, cabe preguntar ahora si al radicarse la demanda en la Corte de Distrito de Arecibo el supuesto abandono del marido por la mujer se había extendido por el término de un año como exige el inciso 5 del artículo 96 del Código Civil (edición 1930).

A este efecto conviene tener en cuenta las disposiciones del Código Político respecto a la forma de computar los términos. Su artículo 388 prescribe:

"*Artículo 388.—El tiempo en que cualquier acto prescrito por la ley debe cumplirse*, se computará *excluyendo el primer día e incluyendo el último*, a menos que éste sea día de fiesta, en cuyo caso será también excluído." (Bastardillas nuestras.)

Excluyendo el 4 de mayo de 1937, día en que la demandada salió del hogar, y empezando a contar el período de la separación a partir del día siguiente, o sea el 5 de dicho mes, tendremos que el año de separación venció el 4 de mayo de 1938, pero como este último día hay que incluirlo en la

computación del término conforme dispone el artículo 388 del Código Político, supra, el término del año de separación venció al expirar dicho día 4 de mayo de 1938. Por consiguiente, la demanda radicada el día 5, lo fué en tiempo, o sea después de vencido el año. *Nickerson* v. *Pres. & Fellows of Harvard College* (Mass., Nov. 7, 1937) 11 N.E. (2d) 444; *Pacific Mutual Life Ins. Co.* v. *Alsop,* 134 N.E. 290; *Earle Improvement Co.* v. *Chatfield,* 99 S.W. 84; *Meridian Life Ins. Co.* v. *Milam,* 188 S.W. 879.

Pero hasta ahora hemos venido refiriéndonos al período de separación. A los efectos del abandono como causa de divorcio, no es el momento en que se inicia la separación cuando empieza el término a partir del cual ha de contarse el año del abandono, sino el momento de la nolición, o sea aquél en que el cónyuge demandado expresa su firme y decidido propósito de abandonar a su compañero.

De la evidencia del propio demandante resulta que la demandada salió del hogar conyugal con motivo de un fuerte altercado con su esposo, asegurándose por uno de los testigos que ella gritaba fuertemente y se hallaba muy nerviosa. Ninguna evidencia existe de que en ese momento expresara ella su propósito de abandonar a su marido. El demandante mismo declaró que ante la insistencia de ella de irse a la casa de sus padres, no pudiendo él disuadirla de que se marchase ni pudiendo acompañarla personalmente, ordenó a sus dos hermanos, Víctor y Carlos Parés, que la acompañaran en un carro público que contrató y pagó el demandante. Cualquier manifestación que ella hubiera hecho en el calor del fuerte altercado con su esposo en relación a su propósito de abandonarlo, claro es que no podía considerarse como la manifestación firme y deliberada de romper para siempre el vínculo matrimonial. Su estado de ánimo lo demuestra el hecho de que no obstante hallarse enferma insistió en salir inmediatamente para Manatí, tomando un automóvil público, sin importarle lo avanzado de la hora. Con razón se dice en 17 American Jurisprudence 194 que las palabras dichas por

la esposa en el momento de separarse de su marido generalmente no son interpretadas como demostrativas de su intención de abandonar a su esposo dentro del significado que la palabra "abandono" tiene como causa de divorcio.

Y la doctrina no es nueva en esta jurisdicción. Se ha dicho en el caso de *Jirot* v. *Crispín,* 23 D.P.R. 822, 823:

"Consta que la demandada ha estado separada del demandante por más de un año, pero no cómo empezó la separación, y si bien el demandante practicó gestiones para que volviera a su lado, no aparece cuándo fué que se iniciaron esas gestiones, *requisito indispensable para poder apreciar que la esposa ha estado separada del esposo por más de un año. La mera separación con consentimiento o tolerancia del otro cónyuge no puede constituir abandono. Es requisito indispensable para el abandono la nolición del otro cónyuge, y desde que esa nolición se manifiesta, empieza a correr el término del abandono."*

En una extensa monografía que aparece en 138 Am. State Rep. 146, 148, sobre lo que constituye "abandono" como causa de divorcio, se expone la misma doctrina en los siguientes términos:

"La mayoría de los estatutos establece el período que debe transcurrir antes que un cónyuge pueda instar pleito de divorcio basado en el abandono del otro. Las decisiones uniformemente sostienen que el abandono empieza cuando se manifiesta el propósito de abandonar, ya sea esta manifestación por acto o por declaración." (Se citan casos de distintas jurisdicciones.)

Veamos en este caso cuándo manifestó la demandada, de acuerdo con la prueba del demandante, su firme y deliberado propósito de abandonar a su esposo.

La demandada niega enfáticamente que jamás haya tenido tal propósito; por eso nos limitaremos a la prueba del demandante, aceptándola como cierta a los efectos del argumento.

De la declaración del propio demandante resulta lo siguiente:

"P. ¿Usted vive en la actualidad con su esposa?

"R. No, señor.

"P. ¿Desde cuándo?

"R. Desde mayo 4, 1937, estamos separados.

"P. ¿Qué motivó esa separación?

"R. Pues para esa fecha hubo una diferencia, un altercado de ella y yo, y a pesar de la insistencia mía y de los consejos míos y de mi familia ella insistió en irse para su casa.

"P. Para esa fecha ¿dónde vivía usted?

"R. Vivía en el Condado, en la Calle Wilson.

"P. ¿Avenida Wilson?

"R. En la casa del Fiscal Massari.

"P. Una vez abandonada la casa, como explicó usted, por ella, ¿usted tomó alguna medida para hacer que volviese al hogar?

"R. Sí, en una ocasión, pocos días después, le envié a usted.

"P. ¿Al abogado que pregunta?

"R. Al abogado que me pregunta, en su carácter de familiar mío.

"P. ¿En alguna otra ocasión?

"R. Después envié a dos de mis hermanos.

"P. ¿Y cuál fué el resultado de esas gestiones?

"R. Absolutamente negativo; no quiso en ninguna forma.

"P. ¿Y usted personalmente tuvo ocasión de hacer también una gestión?

"R. Hace pocos meses, contestando una llamada telefónica de ella, asistí, concurrí a una casa donde estaba ella en la Calle Morell Campos, en Santurce, y yo creí que íbamos a hablar en términos amistosos para arreglar esta situación, y simplemente se me habló de divorcio y condiciones económicas.

"P. ¿Se le habló de divorcio a base de condiciones económicas?

"R. Sí, señor.

"P. ¿Cuál fué el resultado de esa misión suya? ¿Usted consiguió que volviese a la casa?

"R. En absoluto." (T. de E., págs. 2–3.)

Y del examen de repreguntas aparece también:

"P. ¿En qué fecha fué que la señora Echandi salió de la casa de usted en el mes de mayo de 1937, que día del mes de mayo, no recuerda?

"R. Lo recuerdo porque se nombra en los papeles de este caso. El 4 de mayo.

"P. ¿El mismo día se nombra en los papeles de este caso?

"R. Exacto.

"P. ¿Usted recuerda adonde fué su esposa cuando salió de su casa en aquella ocasión?

"R. Pues yo la envié a casa de su señora madre, acompañada de dos hermanos míos.

"P. ¿De modo que usted la envió?

"R. La hice acompañar de mis hermanos, ante la insistencia de ella.

"P. ¿La envió a casa de los familiares de ella?

"R. La envié no; la hice acompañar por dos hermanos míos a la casa de su madre, pues era determinación absoluta de ella de irse.

"P. ¿A la casa de su mamá en qué sitio?

"R. En Manatí.

"P. ¿Y a la casa de la mamá de ella en Manatí la llevaron dos hermanos suyos?

"R. La acompañaron.

"P. ¿En qué automóvil?

"R. Fueron en un carro público porque yo no tengo chófer.

"P. Ese carro público, ¿usted recuerda quién lo contrató?

"R. Nosotros, un hermano mío.

"P. ¿A nombre de usted?

"R. A nombre mío.

"P. ¿Lo pagó usted?

"R. Sí.

"*         *         *         *         *         *         *

"P. ¿Quiénes fueron las personas esas que hicieron las gestiones de que usted nos habló hace un momento?

"R. Fué mi primo, el Lic. Díaz Collazo, y mis dos hermanos Víctor y Carlos.

"P. ¿Usted no recuerda, más o menos, para qué fecha hicieron estos hermanos suyos las gestiones de que usted nos ha hablado?

"R. Poco tiempo después de haberse ido.

"P. ¿Cómo cuánto tiempo después?

"R. No recuerdo exactamente; las próximas semanas; inmediatamente después.

"P. ¿Estos hermanos suyos fueron los mismos que la acompañaron a Manatí?

"R. Que la acompañaron a Manatí.

"P. ¿Y esos hermanos suyos que la acompañaron a Manatí fueron los mismos que usted mencionó ahora que hicieron las gestiones a nombre suyo y cerca de ella?

"R. Sí, señor.

"P. ¿Aquí o en Manatí?

"R. En Manatí." (T. de E., págs. 4–6.)

No resulta de la declaración del demandante que el día 4 de mayo de 1937, fecha en que la demandada se trasladó a Manatí, manifestase ésta su voluntad firme y decidida de no vivir más con su marido.

De la declaración de Víctor Parés, que por orden de su hermano el demandante acompañó a la demandada a Manatí, sólo aparece lo siguiente en relación con la salida de esta última:

"P. Alrededor del día 4 de mayo del año pasado, ¿usted se acuerda si usted tuvo ocasión de ir a Manatí?

"R. Sí, señor, por la noche.

"P. ¿Con motivo de qué?

"R. Con motivo de llevar a su casa a mi cuñada que quiso irse.

"P. ¿Por qué dice usted que quiso irse?

"R. Bueno, porque yo recuerdo que estaba en la sala cuando sentí arriba unos gritos y subí y la encontré a ella en un estado de nervios fuertísimo, y entonces Mon, mi hermano, le razonaba para que no hiciera eso, y ella quería irse a la calle y nosotros le razonamos que no se fuera. Parece que había habido un altercado entre ellos y ella decidió irse de cualquier manera para Manatí.

"P. ¿Definitivamente se fué?

"R. Definitivamente se fué, porque entonces mi hermano mandó a buscar un carro y mi hermano y yo la llevamos.

"P. ¿Qué hermano?

"R. Carlos.

"P. ¿Durante el camino tuvieron ocasión de hablar?

"R. Le hicimos unas cuantas reflexiones, que se dejara de tonterías y ella insistió siempre.

"P. Después de usted haber acompañado a esta señora a Manatí, como usted ha explicado, ¿usted tuvo ocasión de volver a verla?

"R. Sí, señor, cómo no.

"P. ¿Cuánto tiempo después?

"R. Como diez o doce días después.

"P. ¿Después de esa fecha?

"R. Sí, señor.

"P. ¿Donde?

"R. En su casa.

"P. ¿En qué casa?

"R. En la casa de allá, de su mamá.

"P. ¿Pero fuera de San Juan?

"R. Fuera de San Juan, en Manatí.

"P. ¿Por qué fué usted?

"R. Yo fuí porque mi hermano me dijo que fuese y tratase de convencerla para que volviese ella.

"P. ¿Usted la vió?

"R. Sí, señor.

"P. ¿Habló con ella?

"R. Personalmente.

"P. ¿Usted le manifestó el propósito de su visita?

"R. Sí, señor.

"P. ¿Y cuál fué el resultado de su gestión?

"R. El resultado fué que ella dijo que no quería venir más a la casa y que solamente quería divorciarse y arreglar su cuestión económica; que ella quería vivir sola.

"P. ¿Usted le comunicó eso a su hermano luego?

"R. Sí, señor." (T. de E., págs. 10–11.)

En cuanto a la declaración del otro testigo, Carlos Parés, estipularon las partes que su declaración sería igual a la de su hermano Víctor en lo que respecta a lo sucedido el 4 de mayo de 1937 y al viaje que hicieron en esa fecha a Manatí.

De manera, pues, que de la prueba del propio demandante, aceptándola como cierta a los efectos del argumento, resulta claramente que la nolición de la demandada no se manifestó hasta varias semanas después del 4 de mayo de 1937, en que fué visitada por el Lic. Díaz Collazo, y, según se alega, por los hermanos del demandante en dos ocasiones distintas.

Habiéndose manifestado la nolición en este caso, según la prueba del propio demandante, varias semanas después del 4 de mayo, resulta evidente que, aceptando dicha prueba como cierta, la demanda debió haberse radicado varias semanas después del 5 de mayo para que el término de un año de abandono que exige la ley se hubiese cumplido al iniciarse la causa de acción.

El segundo error que acabamos de discutir bastaría para declarar con lugar el recurso y revocar la sentencia; pero la apelante ha imputado a la corte sentenciadora error mani-

fiesto en la apreciación de la prueba.    Penetremos en los méritos del caso.

El propio demandante fué el primer testigo en ocupar la silla testifical.    Su declaración es relativamente breve.    En el examen directo declaró que el día 4 de mayo de 1937 su esposa y él tuvieron ''una diferencia, un altercado'', y que a pesar de sus consejos y reflexiones para que ella no se marchase de la casa, insistió ella en su propósito de trasladarse a la de su madre en Manatí.    Que no pudiendo disuadirla, ordenó a uno de sus hermanos, Víctor Parés, que contratase un automóvil público y que con su hermano Carlos Parés la acompañara a Manatí.    Que poco tiempo después comisionó a su primo, Lic. Díaz Collazo, que visitase a la demandada y la persuadiese de volver al hogar, y que las gestiones de dicho abogado fueron infructuosas ante el propósito de ella de divorciarse.    Que también envió con el mismo objeto a sus dos hermanos anteriormente mencionados y sus gestiones resultaron igualmente inútiles.    Finalmente, que pocos meses antes del juicio, contestando a una llamada telefónica de la demandada tuvo una entrevista con ella en Santurce, en la Calle Morell Campos, pero que en esa ocasión no le habló ella de reconciliación sino de divorcio y de la manera de arreglar su situación económica.    Y en el examen de repreguntas, declaró el demandante que el 4 de mayo de 1937 la demandada estaba conveleciendo después de una operación quirúrgica a que había sido sometida.    Que la madre del demandante estaba en San Juan, asistiéndola.    Que a pesar de que iba frecuentemente a Manatí a ver a su hijo, nunca fué donde la demandada, y aunque a repreguntas del abogado contrario declaró que él se enteraba de la salud de su esposa por su hijo, sin embargo declaró que él no se enteró de su ingreso en la clínica y que según él continuaba ella en buena salud.

Como veremos más adelante en la declaración de la demandada, ésta le indicaba al hijo que le escribiese a su padre, que le preguntase por su salud y le dijese que viniera a verla,

que ella quería verle, etc. A este propósito el abogado de la demandada, en el examen de repreguntas al demandante, le interrogó así:

"P. ¿Cuando el niño de usted estaba en Manatí y estaba la mamá también, el niño suyo le escribía a usted?

"R. Bueno, yo semanalmente . . . El muchachito venía a verme o yo iba a verlo.

"P. En esa ocasión, en esos viajes a Manatí, ¿usted fué a ver a su esposa enferma en la casa donde estaba recluída?

"R. No sabía que estaba enferma.

"P. ¿Pero usted dice que sabía que estaba convaleciendo de una operación quirúrgica?

"R. Que estaba mejorando, que iba muy bien.

"P. ¿Estaba convaleciendo?

"R. Sí, señor.

"P. ¿Usted nunca fué a averiguar?

"R. En las condiciones que estaba . . .

"P. ¿Ni preguntó por ella?

"R. Le preguntaba a mi hijo.

"P. ¿No la visitaba?

"R. No, señor.

"P. ¿Su hijo no le daba las razones que ella le enviaba a usted?

"R. No, simplemente cuestiones de dinero.

"P. ¿No le decía que su mamá quería que usted la fuera a buscar?

"R. Para venir a San Juan, no."

Ocupó en segundo término la silla testifical Víctor Parés, hermano del demandante. Luego de relatar lo que ya conocemos respecto a lo sucedido el 4 de mayo de 1937, declaró en su examen directo que diez o doce días después de haber acompañado a la demandada a Manatí volvió a la casa de ella por encargo de su hermano el demandante, para persuadirla de que volviese al hogar conyugal. Que le contestó ella que no quería venir más a San Juan, que solamente quería divorciarse y arreglar su situación económica. En el examen de repreguntas fué sometido al siguiente contrainterrogatorio:

"P. ¿Entonces fué en el mismo mes de mayo? ' (Se refiere a su visita a la demandada).

"R. Sí, señor, más o menos en el mes de mayo.

"P. ¿Estaba sola o acompañada?

"R. Yo no recuerdo, me parece que estaba sola.

"P. ¿Le parece que estaba sola?

"R. Exactamente no puedo recordar.

"P. ¿A qué hora fué más o menos la visita suya?

"R. Fué una visita por la tarde.

"P. ¿Después de almuerzo?

"R. Por la tarde, después de almorzar.

"P. ¿Pero después de comida o antes?

"R. Antes de comida.

"P. ¿El día específico, usted lo recuerda?

"R. El día específico, no.

"    *        *        *        *        *        *        *

"P. Esa vez que usted fué allá, doce o catorce días después de haberla llevado a ella, ¿fué su hermano también?

"R. No, señor, fuí yo solo."

En tercer término declaró el otro hermano del demandante, Carlos Parés. En el examen directo se le interrogó:

"P. ¿Usted se acuerda haber visitado la casa de la demandada en Manatí con posterioridad al 4 de mayo del año pasado?

"R. Sí, señor.

"P. ¿Usted no se acuerda de la fecha?

"R. Exactamente no recuerdo.

"P. ¿Pero aproximadamente, un mes, mes y medio, dos meses, seis semanas, cinco?

"R. Había transcurrido como dos meses o como mes y medio."

En el examen de repreguntas se le sometió al siguiente contrainterrogatorio en relación con su visita a la demandada:

"P. ¿Usted dice que fué a visitar la casa de la Sra. Parés como mes y medio o dos meses después del 4 de mayo?

"R. Sí, señor.

"P. Para ser más exactos, ¿usted recuerda si fué en el mes de junio o julio que usted fué allá?

"R. Yo creo que en mayo, junio y julio, debe caer por ahí, un término de dos meses.

"P. ¿Pero usted no recuerda si fué en junio o julio?

"R. Exactamente.

"P. ¿Era día festivo o día de trabajo?

"R. No puedo acordarme.

"P. ¿Usted recuerda que día de la semana fué que usted fué allá?

"R. No, señor.

"P. ¿Usted trabajaba para esa fecha?

"R. No, señor.

"P. ¿Qué hacía usted entonces?

"R. Pues eran vacaciones.

"P. ¿Usted estaba estudiando en la Universidad?

"R. Sí, señor.

*　　　*　　　*　　　*　　　*　　　*　　　*

"P. ¿La visita suya fué de día o de noche?

"R. De día.

"P. ¿A qué hora?

"R. No puedo precisar la hora.

"P. ¿Por la mañana o por la tarde?

"R. No recuerdo, no lo tengo en la mente claramente.

"P. ¿Usted habló con la señora Parés?

"R. Sí, señor.

"P. Había otras personas allí presentes?

"R. Pudiera que hubiera algunas personas, aunque no recuerdo con claridad.

"P. ¿No recuerda si era la hermana, la Srta. Parés la que estaba allí?

"R. Podía ser, pero no recuerdo."

Es en verdad raro que estos dos testigos, a pesar de estar declarando aproximadamente un año después de esta visita que tanta importancia tenía para ellos por la delicada misión que llevaban, no recuerden detalle alguno con respecto a las circunstancias que la rodearon, y llama más la atención el hecho de existir relaciones de familia con las personas que habitaban la casa donde se hallaba la demandada, circunstancia que les facilitaría recordar cualquier persona que hubiera estado allí, por ser seguramente familiares de la demandada, perfectamente conocidos por estos testigos.

El último testigo del demandante fué su abogado, el Lic. Román Díaz Collazo, quien declaró que en dos ocasiones dis-

tintas habló con la Sra. Parés, siguiendo instrucciones del demandante y que en dichas ocasiones ella manifestó su deseo de divorciarse y de arreglar lo que ella llamó "su situación económica." El testigo Díaz Collazo no fué repreguntado.

Por la demandada declararon su hermana y su madre, quienes al igual que la demandada negaron enfáticamente que Víctor y Carlos Parés hubieran visitado a la demandada después del 4 de mayo, aunque admiten la visita del Sr. Díaz Collazo, pero declara la demandada que éste no fué con el objeto de reconciliarla con su esposo, sino de hablarle del divorcio.

Declararon además que la demandada estaba la mayor parte del tiempo acostada y que solamente en ocasiones se levantaba para coger sol junto a una ventana. Que ella manifestaba deseos de volver a unirse a su esposo y que así se lo decía a su hijo, que quería volver al hogar en cuanto estuviese mejor, declarando la hermana de la demandada que ella y su madre no querían que volviese a San Juan hasta que no estuviese completamente restablecida. Que la demandada permaneció en Manatí hasta que volvió a recaer, teniendo que ingresar nuevamente en la clínica.

La demandada declaró en los siguientes términos:

"P. ¿Usted se marchó de su casa el día 4 de mayo del año pasado?

"R. Sí, señor.

"P. Tenga la bondad de decirle a la Corte en qué forma salió usted de su casa ese día.

"R. Yo salí el día 4 de mayo con el consentimiento de mi esposo para mi casa en Manatí, porque yo estaba recién operada de vientre y necesitaba restablecerme, y en mi casa pues estaba la mamá de él asistiéndome, mientras yo estaba en mi casa; pero la mamá de él es una persona ya mayor y tiene el padecimiento de filaria. La casa es de dos plantas y tenía que subir y bajar muchísimo, y yo le dije a mi esposo que era más conveniente que yo me fuera a casa de mi mamá a Manatí, que había otros parientes más que me podían asistir también porque su madre tenía mucho trabajo conmigo, y que había visto que por yo no molestarla yo no me hacía las cosas; porque parece que el esfuerzo que yo hice en levantarme un poquito me hizo mal y

tuve una recaída, y le indiqué a mi esposo que era más conveniente que fuera a casa de mi mamá para restablecerme allí mejor, para cuando estuviera restablecida volver a mi hogar y atenderlo a él y a mi hijo.

"P. ¿De modo que usted fué el día 4 de mayo a casa de su mamá a Manatí, con el consentimiento del esposo suyo?

"R. Sí, señor.

"P. ¿Quién la llevó a usted a Manatí?

"R. Los hermanos de él. Víctor y Carlos.

"R. ¿Su esposo no fué a Manatí?

"R. No, porque él tenía muchísimo trabajo en esos días y me dijo que no podía llevarme, que me iba a mandar con sus hermanos y por la tarde me llevaron sus hermanos.

"P. ¿Cuánto tiempo estuvo en casa de su mamá en Manatí?

"R. Estuve todo el tiempo hasta que volví a recaer y entonces me tuve que venir a la clínica Díaz García a someterme a un tratamiento.

   \*      \*      .\*      \*      \*      \*      \*

"P. ¿En el tiempo que estuvo usted en Manatí, su esposo de usted la fué a visitar?

"R. No volvió más.

"P. ¿Usted le mandó recado; qué gestiones hizo usted?

"R. Yo le avisé y mandé a mi hijo. Yo hice todas las gestiones para que él fuera a verme, porque yo quería que fuera a verme, y además lo hacía mi hijo, que le escribía a su padre el estado mío, y para que me enterara del estado de él también, porque como yo lo quiero, estaba interesada en saber el estado de salud de él, y como yo no podía escribir, hacía que mi hijo lo hiciera, y mi hijo hacía todas las gestiones que yo le decía, porque mi hijo cuando no estaba con mamá en casa, estaba en la casa de la abuelita de él en Manatí, en casa de la mamá de él que iba a verme todos los días.

"P. Cuando usted vino a San Juan, ¿usted hizo alguna gestión cerca de su esposo para que él fuera a verla y la llevara a su casa?

"R. Yo lo llamé para que fuera a la clínica a buscarme y no tuve contestación de él ninguna.

"P. ¿Especialmente usted le puede decir a la Corte si al marcharse usted el día 4 de mayo a Manatí, tuvo usted la intención decidida de abandonar el hogar de usted, abandonar a su esposo y a su hijo y separarse para siempre de él?

"R. No, la intención mía no fué esa; la intención mía fué recuperar bien mi salud para poderlos atender a ellos.

"P. ¿Usted le hizo saber eso a su esposo, antes de irse?

"R. Se lo hice saber, sí, señor.

"P. ¿Y su esposo estuvo conforme con que se hiciera así?

"R. Sí, señor, y entonces él me mandó a Manatí.

"R. ¿El compañero Díaz Collazo, abogado del señor Parés, manifestó aquí en sala que había tenido cierta conversación con usted, el Lic. Susoni y otro señor en la casa de usted en Manatí, existieron dos entrevistas?

"R. Sí, señor.

"P. ¿Usted tiene la bondad de decirle a la Corte si en alguna ocasión, en esas dos entrevistas, le manifestó a alguien, o hizo manifestaciones públicas de que tuviera la intención decidida y firme de abandonar a su esposo?

"R. Yo nunca hice esas manifestaciones. Yo siempre decía que estaba deseosa de volver a mi hogar, y a los pocos días de estar en casa, enferma, llegó el Lic. Díaz Collazo y yo le pregunté por mi esposo, que por qué no iba a verme, que yo necesitaba verlo, que quería verlo, que quería verlo a mi lado, que yo lo quería, que iba a Manatí y no me iba a ver y que eso me hacía sufrir mucho que él no fuera a verme; y como yo no podía salir encargué a mi hijo que le escribiera para que le preguntara por su salud, por la salud de mi esposo.

"P. ¿Y en la estrevista que tuvieron en la oficina del Lic. Susoni, en algún momento hizo usted manifestaciones allí en el sentido de que quería romper con su esposo, que era definitiva su actitud de abandonarlo?

"R. Ellos me hicieron proposición de un divorcio, pero fueron proposiciones hechas por ellos.

"P. ¿No hechas por usted?

"R. No, señor, nunca.

"P. ¿Usted en algún momento ha expresado la idea de divorciarse de su esposo de usted?

"R. Nunca, nunca.

"P. ¿Usted ha expresado en algún momento su intención de abandonarlo a él definitivamente?

"R. No, señor.

"P. ¿Está usted en condiciones, y está usted dispuesta a volver a vivir con su esposo, ahora mismo, inmediatamente, en el momento en que él quiera?

"R. Sí, señor.

La demandada tampoco fué repreguntada.

En el caso de *Fernández* v. *Hernández,* 8 D.P.R. 237, 242, este tribunal, por voz del Juez Asociado Sr. Figueras, se expresó así:

"Apeló el esposo Don Serapio Fernández y tanto él como su esposa comparecieron ante esta Corte Suprema por medio de sus abogados respectivos Díaz y Texidor y Don Eduardo Acuña, presentando el primero su alegato en el que minuciosamente analiza la prueba practicada que es favorable al divorcio, dice, y afirma que no puede darse a la declaración de la esposa demandada el alcance que le da el Juez sentenciador porque es aislada y está contradicha por la prueba testifical.

"El fiscal y la representación de la parte apelada sostienen por el contrario la justicia de la sentencia recurrida y en el acto de la vista expusieron oralmente las razones conducentes a su derecho.

"Tiene razón el Juez sentenciador. El cónyuge que ejercita la acción trascendental de divorcio que ha de romper el vínculo matrimonial y destruir el hogar que nació por el mutuo amor y en donde existen hoy hijos inocentes, debe estar limpio de toda culpa, debe ser una verdadera víctima que agotó todos los medios amistosos para detener el mal en su origen.

"Pero cuando esto no sucede tiene el juzgador que meditar con serenidad de espíritu y pesar en todo lo que valgan las causas generadoras del rompimiento que se interesa.

A este mismo efecto se dice en la monografía antes citada de American State Reports, página 155:

"*Buena fe al buscar reconciliación.*—Cuando el demandante establece la acción de divorcio por motivo de abandono y está en el deber de procurar la reconciliación, por ser la parte demandante, ya sola o en unión de la parte demandada, responsable de la separación o abandono, se le requiere no sólo que haya tratado de conseguir la reconciliación sin resultado positivo alguno, si que también que la gestión haya sido hecha de buena fe y antes de que haya expirado el período estatutario." (Se citan casos.)

En el presente caso no vemos por parte del demandante una disposición sincera o *bona fide* a solicitar la reconciliación con su esposa. Aceptando su versión sobre la causa de la retirada de la esposa del hogar, resulta que ese altercado o diferencia, como él lo llama, tuvo lugar cuando ella hacía

poco había regresado de una clínica donde fué sometida a una intervención quirúrgica y cuando aún se hallaba enferma. No penetraremos en los móviles del disgusto. Basta que ella estuviese enferma para que, con razón o sin ella, mereciese la consideración de su esposo. Sin embargo, ella se marcha, él va a menudo a Manatí y ni siquiera se digna inquirir por su salud. A pesar de que dice que su hijo de diez y siete años le informaba que su esposa seguía mejor sin embargo de su propia declaración resulta que él ignoraba que ella hubiera tenido que regresar a una clínica a Santurce por haber empeorado su enfermedad, declarando que vino a enterarse de que estuvo en la clínica cuando le trajeron la cuenta.

¿Acaso no está justificada una esposa en estas condiciones en rehusar, si es que rehusó, la proposición que a través de otras personas le hiciera el marido para que volviera al hogar conyugal? ¿No estaba ella justificada en creer que el marido, que la ve salir de su hogar enferma, que va a Manatí frecuentemente y no se digna visitarla, y que demuestra una absoluta despreocupación por su salud, no estaba justificada en creer, repetimos, que al requerirla el demandante por medio de otras personas para que reasuma la vida conyugal, no lo hace sinceramente y movido por el cariño que ella debe esperar del padre de su hijo, a quien ha estado unida en matrimonio por espacio de diez y ocho años? Que la demandada hubiera estado justificada al así pensar, lo demuestra de manera evidente la impaciencia manifiesta del demandante al radicar la demanda de divorcio tan sólo unas horas después de vencido el período del año de separación.

El caso de *Más* v. *Muñoz*, 35 D.P.R. 870, presenta una situación análoga a la de este caso. La opinión del tribunal, escrita por el Juez Presidente Sr. Del Toro es muy breve y la transcribimos a continuación:

"En octubre de 1922 José Más Guardiola estableció demanda de divorcio contra su esposa alegando que ésta lo había abandonado por más de un año. Contestó la demandada alegando a su vez que fué su esposo el que se separó de ella; que no tenía el propósito de se-

pararse, y que estaba dispuesta a vivir con el demandante en el momento en que así se lo manifestara.

"Fué el pleito a juicio. La prueba del demandante consistió en su declaración y en la de Carlos Matos y José A. Florido. La de la demandada en su declaración y en la de los testigos Ildefonso Estrella y Felipe Zavala. Hemos analizado esa prueba y es en algunos extremos contradictoria. Aceptando que el conflicto fué resuelto por la corte y que debamos partir de la base que más favorece al demandante, aún así opinamos que el abandono que la ley y la jurisprudencia exigen como causa determinante del divorcio no se ha demostrado cumplidamente.

"No basta el hecho material de la separación; no son suficientes meros disgustos. Es necesario el propósito firme y deliberado y la actuación consiguiente de vivir separado, de romper de hecho el vínculo matrimonial, para que el abandono exista. Y aquí la mujer no ha procedido de tal modo. Declarando en el juicio se expresó así: 'que nunca ha sido su intención separarse definitivamente de su esposo, no lo ha pensado, como lo ha querido mucho y es el padre de sus hijos, es el único hombre que ha querido.'

"Se trata de un matrimonio joven aún con muchos hijos, sin bienes de fortuna, que puede y debe subsistir. Sólo sumando sus fuerzas materiales y espirituales podrá ese matrimonio cumplir aún fielmente su destino.

"Debe revocarse la sentencia apelada y declararse la demanda sin lugar."

En el caso de *Arce* v. *Lebis,* 50 D.P.R. 899, 905, donde se presentó una situación parecida, aunque no idéntica a la del presente caso, al revocar la sentencia que decretó el divorcio, se dice por este tribunal por voz de su Juez Asociado Sr. Travieso:

"No encontramos en el récord prueba suficiente de un propósito firme y decidido por parte de la demandada de vivir separada de su esposo. Por el contrario, ésta declaró a preguntas de su abogado, como sigue:

" 'P. Dígame, señora: ¿usted está dispuesta y ha estado dispuesta siempre a vivir con su esposo y a seguir como estaban antes de haberse él marchado?

" '*       *       *       *       *       *       *

" 'R. Yo siempre traté de evitar todo disgusto entre nosotros y pasé por todo y ví muchas cosas que para mí han sido muy doloro-

sas y tristes y que no las nombro porque me da vergüenza, y a pesar de todo siempre traté de evitarlo todo para que hubiera paz y unión en el hogar porque siempre tuve la fe de que todo eso pasaría y que él volvería a ser como antes.

'' 'P. ¿Actualmente usted está dispuesta a vivir con su esposo?

'' 'R. Siempre he estado y estoy dispuesta a vivir con mi esposo porque siempre lo he querido.

'' 'P. ¿Y aún lo quiere?

'' 'R. Y lo quiero y es el padre de mi hija y si hubiera venido lo hubiera aceptado en cualquier momento.'

''Del récord no aparece que el esposo demandante haya expresado en momento alguno iguales sentimientos de amor o deseos de reconciliación con su esposa.''

En la opinión emitida por el juez inferior refiriéndose a las manifestaciones de la demandada respecto a sus deseos de reasumir la vida matrimonial con su esposo, dice lo siguiente:

''Y su manifestación hecha al final de su testimonio, de que está en condiciones de reasumir la vida matrimonial cuando su esposo lo desee, no parece ser la expresión franca y sincera de la esposa abandonada que anhela unirse a su marido y sí mera oferta sin verdadero propósito de llevarla a efecto, demostrado por su actitud anterior.''

Hemos examinado la transcripción de evidencia y en realidad de verdad no encontramos que esta aseveración del juez inferior esté suficientemente justificada por la prueba.

A nuestro juicio existió también error manifiesto en la apreciación de la prueba.

*Por lo expuesto, procede en este caso revocar la sentencia apelada y en su lugar dictar otra desestimando la demanda, con costas al demandante, incluyendo la cantidad de $200, que se fija como honorarios de abogado.*