SILVERIO MATÍAS, demandante y apelado, *v.* SAM SCHWEITZER, haciendo negocios bajo el nombre de SCHWEITZER & Co., JUAN RAMOS VÉLEZ y PORTO RICAN & AMERICAN INSURANCE Co., demandados y apelantes.

Núm. 7802.—*Sometido:* Noviembre 6, 1939. *Resuelto:* Diciembre 15, 1939.

*Brown, González & Newsom,* abogados de los apelantes; *García Méndez & García Méndez,* abogados del apelado.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Silverio Matías sufrió ciertas lesiones al ser arrollado por un automóvil el día 5 de junio de 1936 en momentos en que caminaba por la carretera que de Rincón conduce a Aguada. Para resarcirse de los daños sufridos instó esta acción en la Corte de Distrito de Aguadilla contra Sam Schweitzer, haciendo negocios bajo el nombre de Schweitzer & Co., Juan Ramos Vélez y Porto Rican & American Insurance Co., dueño, chófer y aseguradora, respectivamente, del automóvil causante del daño.

La corte de distrito apreció la prueba, que fué contradictoria, y al dirimir el conflicto de la evidencia a favor del demandante, dictó sentencia condenando a los demandados a pagar solidariamente al demandante la cantidad de $2,900 por concepto de los daños personales sufridos, $500 por asistencia médica y reclusión en la clínica, $50 por concepto de medicinas, inyecciones y gastos en alimentación especial, y $800 en que fijó los honorarios de abogado—en total $4,250 —más las costas, gastos y desembolsos.

Los demandados interpusieron este recurso imputando a la corte sentenciadora siete errores que discutiremos conjuntamente en el curso de esta opinión.

La principal contención de los apelantes es que la corte sentenciadora, movida por pasión, prejuicio y parcialidad, cometió error manifiesto en la apreciación de la prueba.

La descripción que del accidente hacen el demandante y sus testigos puede resumirse así: el demandante abordó un

automóvil en Aguada para dirigirse a su casa, para llegar a la cual es necesario abandonar la carretera en el trayecto comprendido entre Aguada y Rincón, y tomar un camino que empalma con el margen izquierdo de dicha carretera en dirección a Rincón. Cuando se aproximaba al mencionado camino, el demandante avisó al chófer del automóvil en que viajaba que detuviese la marcha para bajar. El automóvil se detuvo algunos metros después de pasar de la entrada del camino, motivando con ello que el demandante tuviese que caminar hacia atrás para alcanzarlo. Según el demandante y sus testigos, caminó aquél por la orilla izquierda de la carretera con dirección a Aguada, llevando consigo unos paquetes, y mientras así caminaba, el automóvil del demandado, que marchaba en igual dirección que el demandante, es decir, de Rincón hacia Aguada, se desvió de su derecha, yendo a parar a la izquierda de la carretera, donde arrolló al demandante, encajándole en la espalda el tirador de la puerta trasera izquierda del automóvil, arrastrándolo unos cuantos metros, desviándose entonces hacia la derecha y yendo a parar en un sitio próximo al camino vecinal por donde debía entrar el demandante para dirigirse a su casa. El demandante asegura que él no vió el automóvil ni oyó *klaxon*, bocina ni algún otro aparato de alarma. Aseguran sus testigos que el automóvil marchaba a una velocidad exagerada, sin dar aviso alguno de su aproximación.

La versión de los demandados es que su automóvil se cruzó con aquél en que había venido el demandante en un sitio en que se hallaba otro automóvil estacionado a un lado de la carretera surtiéndose de petróleo, por habérsele agotado la gasolina. Que no pudiendo pasar los dos vehículos al mismo tiempo debido al espacio que ocupaba el que se hallaba estacionado, el de los demandados redujo su velocidad para dejar pasar a aquél en que había venido el demandante. Que prosiguió su marcha, y al observar que el demandante, que caminaba a pie por la orilla izquierda

de la carretera, hizo ademán de cruzarla caminando uno o dos pasos hacia el margen derecho por donde iba el automóvil de los demandados, el chófer redujo su velocidad y tocó *klaxon,* deteniéndose el demandante en ese momento, pero acto seguido, viendo que el demandado reducía la velocidad el demandante echó a correr súbitamente para cruzar la carretera, y que no obstante los esfuerzos del chófer para evitar el accidente, desviándose todo lo que pudo sobre el paseo a su derecha, el demandante en su carrera vino a chocar con el tirador de la puerta izquierda trasera, encajándosele y produciéndole la lesión que motivó este pleito. Dos de los testigos de los demandados, que se hallaban echando unas botellas de petróleo en el tanque del automóvil anteriormente mencionado, aseguraron que ellos oyeron el ruido que hizo el automóvil del demandado al aplicar por primera vez los frenos, e inmediatamente después oyeron y vieron la refrenada que tuvo que hacer en el momento en que el demandante era arrollado en la orilla derecha de la carretera, yendo de Rincón para Aguada, que era precisamente la derecha correspondiente al automóvil del demandado. Algunos testigos de los demandados aseguraron que vieron marcado en la orilla derecha de la carretera el rastro que dejaron las ruedas del automóvil al serle aplicado los frenos.

Además de los testigos oculares de los demandados, se presentó en evidencia el asiento en el libro de novedades de Aguada, en el que aparecen las manifestaciones que dijo el policía Serrano le había hecho el demandante el mismo día del accidente, tendentes a demostrar que dicho accidente había sucedido en la forma que lo describen los demandados. Se presentó también una declaración escrita que se alega fué prestada por el demandante ante el Jefe de Distrito de Aguada, Sr. Carlos Guadalupe, el 9 de junio de 1936, cuatro días después del accidente, en que el demandante lo relata tal y como lo hacen los demandados.

Resolviendo el conflicto de la evidencia, la corte sentenciadora se expresó en su opinión en los siguientes términos:

"La evidencia en cuanto a la forma en que ocurrió el accidente es de carácter contradictorio y la Corte resuelve el conflicto en el sentido de dar crédito a los de la parte actora, no creyendo el testimonio de los testigos de la parte demandada.

"Además, por lo que resulta de un examen somático de la herida y del testimonio del perito Dr. Néstor de Cardona, la lesión presenta una deformidad monstruosa semejante en forma y tamaño a un coco de agua llegado a su plena madurez.

"En el curso del juicio, el Juzgador, con la oposición del demandante, admitió copia del informe sobre el accidente rendido el 7 de junio de 1936 por el Jefe Guadalupe de la Policía Insular de Aguada al Cuartel General, y el libro de novedades en el que aparece el asiento que sobre el accidente de referencia hizo de su puño y letra el policía Serrano, ambos a los fines de corroborar el testimonio de estos testigos ofrecidos por los demandados. Y además admitió la Corte una declaración que se alega haber sido prestada y signada por el demandante el día 9 de junio de 1936 en el Hospital de Aguada.

En sus testimonios el Jefe Guadalupe y el policía Serrano sostuvieron que el día del accidente el demandante dió una versión del accidente en la forma alegada por los demandados en su contestación, y que fué a virtud de ese informe y la investigación de dos testigos que se rindió el informe al Cuartel General el día 7 y se hizo constar el accidente en el libro de novedades del Cuartel de la Policía en Aguada.

"No hay discrepancia alguna entre las partes en cuanto a que, una vez ocurrido el accidente, el herido, o sea el demandante, fué conducido en el auto del demandado Schweitzer a Aguada, y por no haber allí quien lo asistiera, fué traído seguidamente a Aguadilla, donde recibió la primera cura en la clínica del Dr. Néstor de Cardona y por el propio Dr. Cardona. Fué después de esto que se llevó nuevamente al enfermo al Hospital de Aguada en la tarde del mismo día (el accidente ocurrió entre dos y tres de la tarde), y después de recluído en el Hospital de Aguada, dió cuenta el *chauffeur* demandado al Jefe de la Policía de Aguada, y en el mismo cuartel, de la ocurrencia del accidente.

"Según el Jefe Guadalupe, él seguidamente se llevó al policía Serrano a quien no recuerda si cogió en el Cuartel o abajo, pero asegura que se fueron juntos al sitio del suceso, y entonces fué que

se enteró Serrano del accidente. Serrano, sin embargo, sostiene que antes de él ir a investigar el accidente al sitio del suceso fué al Hospital y allí se enteró con el propio demandante respecto de la forma y manera en que ocurrió el accidente. Y por otro lado el Jefe Guadalupe sostiene que fué después de la investigación en el sitio de autos que él y Serrano fueron al Hospital a ver al demandante Matías y a hablar con él.

"Sin embargo, el Dr. Cardona que vió y atendió al herido en su clínica en Aguadilla, y el Dr. Luiggi, perito de los demandados, sostienen que el demandante Matías no tenía lucidez mental debido al trauma y sus consecuencias y no podía hacer una relación del accidente. Y el Dr. Cardona además sostuvo que Matías no tuvo el dominio de sus facultades por muchos días.

"El Juzgador cree que Matías no estaba en condiciones de hacer las manifestaciones que le atribuyen Guadalupe y Serrano, y cree más, cree que él no hizo esas manifestaciones ni manifestación alguna relativa a cómo ocurrió el accidente. Su estado de 'shock' que describe el Dr. Cardona se lo impedía. Por tanto, el informe dado por el Jefe Guadalupe el 7 de junio al Cuartel General de la Policía en cuanto menciona las supuestas manifestaciones de Matías, es a todas luces incierto. En cambio, el informe en el libro de novedades, hecho el mismo día 5 por Serrano en presencia de Guadalupe y bajo la dirección de éste, no menciona para nada las alegadas manifestaciones de Matías.

"El Juzgador quedó sorprendido con el testimonio del Jefe Guadalupe en relación con una declaración que dijo fué prestada por Matías el 9 de junio, o sea cuatro días después del accidente, cuando, según el testimonio del Dr. Cardona, que merece entero crédito al juzgador, el demandante todavía no tenía lucidez mental, ni podía relatar el accidente con los detalles que aparecen de la supuesta declaración, ya que una vez arrollado Matías él perdió el conocimiento y dominio de sus facultades mentales. Esta declaración fué tomada por el Jefe Guadalupe a las 8 ó 9 de la mañana del 9 de junio en el Hospital de Aguada, que está en el mismo pueblo, apareciendo como testigo del signo el ajustador de la compañía Sr. Hernández, cuando pudo haberse tomado como testigo al Dr. Luiggi o a la enfermera que estaba en el Hospital, o a algún otro vecino. Resulta inusitada la forma de tomar esta supuesta declaración y el interés y la actuación del Jefe Guadalupe, y más inusitada aún, la circunstancia extraordinaria de que, aunque Guadalupe sostuvo que él no pretendía que la declaración fuera jurada

ante él, la misma aparecía, de su faz, jurada ante él el 9 de junio de 1936, firmándola Guadalupe en el sitio que correspondía firmar al Juez, como prueba de la toma de juramento, sustituyendo la denominación de 'juez' por la de 'Jefe Dtto. P. I.' ¿Qué interés tenía Guadalupe? ¿Por qué no aguardar la llegada del Juez? Esa declaración la entregó Guadalupe a la compañía demandada por conducto del Sr. Hernández, el ajustador que estuvo presente en Corte durante todo el juicio, y fué admitida por este Tribunal.

"Matías, en el *rebuttal,* negó haber hecho las declaraciones que le imputaban Guadalupe y Serrano, y negó haber prestado la declaración de junio 9. Hernández no ocupó la silla testifical y nada dijo en relación con este incidente.

"Por todas estas circunstancias y acontecimientos inusitados y porque la Corte cree que el accidente ocurrió en la forma relatada por los testigos del demandante, no le merecen crédito los testimonios de Guadalupe y Serrano."

Si consideramos que era el propósito del demandante tomar el camino de su casa, para lo cual precisaba cruzar la carretera en o alrededor del sitio en que fué arrollado; si tenemos en cuenta que un automóvil conducido por la orilla de una carretera normalmente no abandona su rumbo para ocupar el margen opuesto, y por último si consideramos que a veces un viandante al enfrentarse de súbito con una situación de peligro se confunde y lejos de huir se lanza al mismo, fácil es concluir que la teoría de los demandados es más probable que la del demandante y sus testigos. Sin embargo, esta última teoría no es físicamente imposible. A veces una distracción del chófer, un desnivel en la carretera, y hasta un pequeño obstáculo sobre el cual pase una de las ruedas delanteras en momentos en que esté distraído el chófer, pueden desviar el automóvil si marcha a una gran velocidad, como iba el de los demandados según aseguraron los testigos del demandante. No siendo la versión de éste físicamente imposible, estando tal versión sostenida por la prueba del demandante, que fué creída por el juez sentenciador, quien tuvo la oportunidad de que no disponemos nosotros de observar los gestos y vacilaciones de los testigos

al contestar el interrogatorio a que fueron sometidos, y en general su conducta en la silla testifical, no debemos alterar la conclusión de la corte sentenciadora a menos que de la prueba surja que al apreciarla actuó el juez movido por pasión, prejuicio o parcialidad.

En el caso de *Ayala* v. *Matías,* 54 D.P.R. 348, invocado por los apelantes, en el cual la teoría del demandado era semejante a la sustentada por los apelantes en el caso de autos, esta corte no alteró, sino que por el contrario aceptó, la apreciación que de la prueba hizo la corte sentenciadora. Lo mismo hubiéramos hecho en este caso si la corte *a quo* hubiese dado crédito a la prueba de los apelantes. Generalmente en los casos en que no hemos aceptado la apreciación de la evidencia hecha por la corte sentenciadora ha sido, bien porque la prueba aceptada por la corte no justificaba sus conclusiones, o porque la evidencia de la parte apelada estaba huérfana de un elemento esencial para la existencia de la causa de acción. Véanse los casos de *Navarro* v. *Compañía Azucarera El Ejemplo,* 53 D.P.R. 726, *Méndez* v. *Serracante,* 53 D.P.R. 849, y *Parés* v. *Echandi,* 55 D.P.R. 163.

La indignación que exterioriza el juez inferior al considerar la reprobable conducta del policía Serrano y especialmente la del jefe Guadalupe, está, a nuestro juicio, perfectamente justificada por las actuaciones de estos dos funcionarios y en manera alguna puede esa actitud calificarse de apasionada.

■■ Sostienen los demandados que la corte sentenciadora cometió error al no permitir que su testigo Dr. Luiggi declarase sobre manifestaciones que le hiciera el demandante mientras se hallaba recluído en el Hospital Municipal de Aguada. El incidente se desarrolló así:

"R. Bueno, sí; alguna que otra pregunta, pero como yo no interesaba ningún detalle...

"Abogado del demandante.—Eso es inadmisible como prueba porque para traer esa evidencia era necesario previamente haberle

preguntado a Matías si en alguna fecha él le había hecho al doctor Luiggi manifestaciones contrarias a lo que él estaba declarando en la silla de los testigos, y caso de que las hubiere hecho darle una oportunidad a Matías para que explicara las contradicciones que hubiere entre una declaración y la otra.

"Hon. Juez.—¿Qué dijo él: que no o que sí?

"Continúa el abogado de los demandados preguntando al testigo:

"P. En esos días que Matías estuvo en el Hospital atendido por usted ¿él habló con usted con respecto al accidente que le ocurriera a él?

"R. Sí, señor, algo dijo.

"Abogado del demandante: Yo me opongo a esta pruebá, porque si lo que se quiere traer son manifestaciones anteriores del señor Matías contrarias a lo que él declaró aquí en este caso, han debido echarse las bases para ello y cuando declaraba el señor Matías preguntársele si en tal fecha y en tal sitio él le hizo al doctor Luiggi tales y tales manifestaciones y decirle las manifestaciones.

"Abogado de los demandados: No se le preguntó nada del doctor Luiggi, pero como el testigo ya en su declaración expresó que cualquier cosa que hubiera dicho la hubiera dicho muerto o que fué su espíritu el que habló—esas son palabras textuales de él— eso quiere decir que no le dijo nada a nadie.

"Hon. Juez.—La Corte cree que no se han sentado las bases para esta impugnación, y no admite la prueba que se intenta presentar por los demandados a este fin.

"Abogado de los demandados: Tomamos excepción de la resolución de la Corte por los fundamentos anteriormente expuestos." (T. de E., 398–400.)

El error cometido por la corte sentenciadora al sostener que para poder presentar en evidencia manifestaciones hechas por la parte contraria es necesario sentar las bases que requiere la Ley de Evidencia cuando de impugnar a un testigo se trata (Ley de Evidencia, artículo 159), es evidente. Las manifestaciones de la parte contraria constituyen admisiones y como tales deben recibirse en evidencia sin necesidad de sentar tales bases. Véase 1 *Jones on Evidence, Civil cases,* 4a. ed. (1938), pág. 454, sec. 236.

Pero a pesar del error cometido, éste no justifica la revocación de la sentencia porque del récord no aparece en qué consistían las manifestaciones del demandante que los demandados intentaban probar con la declaración del Dr. Luiggi. Al preguntarse al testigo si en determinada fecha el demandante habló con él sobre lo que le había ocurrido, el testigo contestó: "Bueno, sí; alguna que otra pregunta, pero como yo no interesaba ningún detalle..." De esta contestación no es posible inferir que lo que el demandante dijera al testigo le fuese adverso. Bien pudieran ser manifestaciones favorables al propio demandante o sin relevancia alguna al caso en cuestión. En esas circunstancias, no podemos sostener que el no permitir al testigo contestar la pregunta objetada causó perjuicio alguno al apelante. Los demandados debieron insistir con la corte sentenciadora y anunciar lo que se proponían probar con el testigo. Sólo así hubiéramos estado en condiciones de determinar si el error fué o no perjudicial. [4] Para que la comisión de un error justifique la revocación de la sentencia, no sólo es preciso probar su existencia si que también el perjuicio que pueda haber causado al apelante.

Atendida la naturaleza y carácter permanente de la lesión recibida y los sufrimientos a que ha estado y continuará sometido el demandante por el resto de sus días, la indemnización de $2,900 que por ese concepto fué concedida por la sentencia no es, a nuestro juicio, excesiva.

Veamos lo que el Dr. Néstor Cardona, que curó al demandante, dice sobre la naturaleza de la lesión:

"A él lo trajeron con una herida grande en el costado derecho, una herida que era cortopenetrante y lacerante, y tenía las tripas por fuera, hablando en lenguaje vulgar; tenía una asa intestinal rota, y puesto que el riesgo era grave en aquel momento, como su condición era tan crítica, solamente nos limitamos a hacerle una limpieza a la herida y a ponerle un *pad*, una gasa con algodón bien grande y fajarlo; el *chauffeur* que lo trajo no se quiso hacer cargo de los gastos; nadie se hacía cargo de los gastos; el hombre se

estaba muriendo y lo mandamos a que se muriera al Hospital de Aguada porque él era de allá de Aguada, con instrucciones de que si mejoraba algo que me avisaran; lo fuí a ver a Aguada dos o tres veces y entonces a los once días, el día 16 de junio, lo admitimos en mi clínica más por el interés profesional mío en el caso que por algún lucro porque las condiciones económicas del paciente eran bastante malas y aunque ellos me prometieron pagarme en diferentes zafras y pasarme finquitas a mi nombre yo lo admití en mi clínica más por interés profesional mío que por lo que yo pudiera cobrar en el caso.

"

"La primera vez yo me negué a admitirlo en la Clínica; nadie se hacía cargo de él y era un riesgo sumamente grave, que yo creía que se moriría en pocas horas.'' (T. de E., 138–139.)

"Él fué poco a poco mejorando, y lo único que le hicimos fué fijarle las dos extremidades intestinales, que estaban rotas, a la piel de manera que la excreta no contaminara la cavidad del vientre; en Aguada él fué poco a poco mejorando y entonces a los once días, el día 16 de junio, lo admitimos en la clínica.

"

"Completo uso de razón no lo tenía; un hombre de alguna edad, de sesenta años, que todo lo que comía se le salía por el costado y que está completamente abandonado, con toda la excreta allí, no se daba cuenta de nada.'' (T. de E., 140, 141.)

"

"Bueno, después de eso se le quedó una fístula fecal.

"P. ¿Qué es una fístula fecal?

"R. Pues es un conducto que va de la tripa al exterior y bota excreta por ahí.

"P. ¿La sigue botando?

"R. De acuerdo con la historia clínica del caso cada dos o tres meses se le abre y vuelve a cerrársele si mantiene una dieta concentrada y elimina los líquidos de su dieta; si toma muy poco líquido se le cierra la fístula y así está mientras mantiene su dieta.'' (T. de E., 141–142.)

"

"P. Dígame, doctor, ¿de modo que usted lo estuvo atendiendo 134 días?

"R. Estuvo hospitalizado 134 días y después lo estuve viendo dos o tres veces por semana.

"P. ¿Y once días que estuvo en el Hospital de Aguada sin venir a su clínica?

"R. Sí, señor.

"P. ¿Y en su clínica estuvo 134 días?

"R. Sí, señor.

"P. ¿Y después de eso lo siguió usted viendo?

"R. Sí, señor, él venía dos o tres veces por semana como por seis meses.

"Dígame, doctor, ¿esa herida era dolorosa?

"R. Era una herida desgarrante; le desgarró los músculos.

"P. ¿Cómo consideraría usted esa herida en ·cuanto a si era dolorosa, poco dolorosa o muy dolorosa?

"R. Muy dolorosa.

"P. ¿Se quejaba mucho él?

"R. Sí, señor.

"P. ¿De qué se valía usted para suprimirle o mitigarle los dolores que sufría este señor?

"R. De inyecciones de morfina.

"P. ¿Y después?

"R. Después le daba algunos sedativos por la boca." (T. de E., 142–143.)

"    .         .         .         .         .         .         .         .·

"P. ¿En qué parte de la espalda tenía la herida y en qué forma se veía que se había producido, o sea, qué trayectoria tenía la herida?

"R. Parece que el gancho lo cogió de atrás hacia adelante y le desgarró los músculos y la región lumbar.

"P. ¿Estando de espaldas el sujeto o de costado? ¿Cómo ha debido estar él?

"R. De espaldas.

"P. ¿De modo que el instrumento que le dió lo cogió a él de espaldas?

"R. Sí, señor.

"P. ¿Y le dió y entonces le desgarró por la derecha?

"R. Sí, señor; de atrás hacia adelante." (T. de E., 143–144.)

"    .         .         .         .         .         .         .         .

"P. ¿Usted cree que con eso que él tiene puede trabajar de azada o machete?

"R. No, señor.

"P.   ¿No es aconsejable que trabaje?

"R.   No, señor."   (T. de E., 146.)

En su opinión, refiriéndose a la herida, dice el juez sentenciador:

"Además, por lo que resulta de un examen somático de la herida y del testimonio del perito Dr. Néstor de Cardona, la lesión presenta una deformidad monstruosa semejante en forma y tamaño a un coco de agua llegado a su plena madurez."

La evidencia demuestra que el demandante ganaba $2 diarios y tenía sesenta años de edad en la fecha del accidente, pues si bien declaró al principio que hacía 57 años que había contraído matrimonio y que al casarse tenía veinte años, inmediatamente después declaró que "se casó para después de San Ciriaco," aunque asegura que no sabe cuántos años hace de dicho ciclón.   Puesto que el ciclón de San Ciriaco tuvo lugar el 8 de agosto de 1899 y el demandante tenía veinte años en aquella fecha, no hay duda alguna de que en el 1936, fecha del accidente, debió tener la edad de 57 años aproximadamente.   El Dr. Néstor Cardona declaró también que el demandante podía tener en la fecha del juicio alrededor de sesenta años.

Tampoco estimamos excesiva la cantidad de $500 concedida por la sentencia por concepto de honorarios médicos, pues dicha suma no sólo incluye la operación quirúrgica y asistencia médica por el Dr. Cardona por espacio de 134 días, si que también su estancia durante esos 134 días en la clínica del indicado médico en Aguadilla.

No debemos alterar la discreción del juez sentenciador al fijar en $800 la partida de honorarios de abogado habida cuenta de la naturaleza del pleito y del trabajo realmente realizado por el abogado de la parte demandante.

*Procede, por lo expuesto, confirmar la sentencia apelada*